UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION

SARAH ILLIG, et al.,             )
                                 )
            Plaintiffs,          )
                                 )
      v.                         )      No. 4:03 CV 135 DDN
                                 )
UNION ELECTRIC COMPANY,          )
                                 )
            Defendant.           )

## MEMORANDUM

This action is before the court on the motion of defendant Union Electric Company to dismiss. (Doc. 128.) The parties have consented to the exercise of plenary authority by the undersigned United States Magistrate Judge pursuant to 28 U.S.C. § 636(c). (Doc. 11.) Oral arguments were heard on September 23, 2010.

## I.  BACKGROUND

On December 23, 2002, plaintiffs Sarah and Gale Illig commenced this action in St. Louis County Circuit Court on behalf of themselves and a class of similarly situated persons. (Doc. 122 at ¶ 10.) Union Electric Company ("Union Electric") removed the case to this court under 28 U.S.C. § 1441(b) on the basis of federal question jurisdiction. (Doc. 1.)

Plaintiffs allege the following facts in their amended complaint:

On March 22, 1984, plaintiffs acquired fee simple absolute title and estate in certain lots of land in Saint Louis County, inclusive of Grantwood Terrace. (Doc. 122 at ¶ 2.) Plaintiffs subsequently conveyed the land to Sarah Illig's Revocable Living Trust ("Trust"). (Id. at ¶ 4.) Sarah Illig is the trustee of the Trust, and both plaintiffs are the beneficiaries. (Id.) The Trust presently owns and holds title to the land. (Id. at ¶ 5.)

Missouri Pacific Railroad Company ("Missouri Pacific") formerly operated a 6.2-mile long rail line on plaintiffs' land, formerly known as the Carondelet Branch, pursuant to an easement obtained in 1872. (Id. at ¶¶ 12-13.) In 1972, Missouri Pacific and Union Electric

executed a Wire License Agreement, which authorized Union Electric to install electric transmission poles, lines, and appurtenances along the rail line ("electric lines"). (Doc. 1, Ex. C; Doc. 129 at 5).

On February 10, 1992, Missouri Pacific filed a Notice of Exemption with the Interstate Commerce Commission (ICC). (Doc. 122-11.) The Notice sought permission from the ICC to abandon and discontinue its railroad operations over the subject property. The Notice stated, "The date of consummation for the Abandonment and discontinuance of operation is on or about March 31, 1992." (Doc. 122-11 at 2.)

By letter, filed with the ICC on February 6, 1992 (confirmed by letter filed February 19, 1992), Gateway Trailnet, Inc. ("Trailnet") asked the ICC to issue a Notice of Interim Trail Use or Abandonment (NITU). By letter filed with the ICC on March 2, 1992, Missouri Pacific indicated its willingness to negotiate with Trailnet for interim trail use. (Doc. 122-12 at 1.)

On March 25, 1992, the ICC issued its Decision and Notice of Interim Trail Use or Abandonment (NITU). (Id.)[1] The NITU stated in part that Missouri Pacific, subject to the conditions set forth in the NITU,

> may discontinue service, cancel tariffs for the line on not less than 10 days' notice to the Commission, and salvage track and related materials consistent with interim trail use/rail banking . . . .

The NITU also gave Missouri Pacific and Trailnet 180 days to negotiate the interim trail use sought by Trailnet. (Id.)

On December 30, 1992, by its Donation, Purchase and Sale Agreement (Doc. 122-13) (the Trail Use Agreement), Missouri Pacific agreed to sell to Trailnet Missouri Pacific's right of way over the subject property, except for the minerals and mineral rights in or under the property and except for the railroad equipment, not including ballast, located on the property. (Id.) That same day, Missouri Pacific signed a quitclaim deed to that effect. (Doc. 122-14.)

Plaintiffs allege they are entitled to money damages and other relief from defendant Union Electric because Union Electric's use of

---

[1]The NITU was authorized by the National Trails System Act of 1968, as amended (the Trails Act), 16 U.S.C. §§ 1241, et seq.

plaintiffs' property exceeds the scope of the easements "created by the Trails Act." (Doc. 122 at ¶ 32.) Plaintiffs allege that by the Trail Use Agreement, Trailnet did not own or acquire property interests in plaintiffs' land that included the right to receive payment from Union Electric for its operation of the electrical transmission lines over this land. (Id. at ¶¶ 30, 31.) Plaintiffs further allege that Union Electric has never obtained an easement or license from the owners of the plaintiffs' land upon which it maintains its electrical transmission lines. (Id. at ¶ 37.)

Plaintiffs allege that "When [Missouri Pacific] abandoned its interest in the land by Quit Claim to Union Electric Plaintiffs and the class members, as a matter of Missouri law, regained the exclusive right to use, possess and occupy the land," but that "[t]he federal Trails Act granted [Missouri Pacific] the right to sell or give to a qualified trail group a right to use the land for an interim public recreational trail and gave the federal Surface Transportation Board [] the ability to authorize a qualified railroad the ability to rebuild a new rail line across the land at some indefinite point in the future." (Id. at ¶¶ 52, 53.) Plaintiffs allege that "The right or interest in the land granted [Missouri Pacific] (and a trail group) under the Trails Act [does] not include the right to use Plaintiffs' land for [] high-voltage electrical transmission lines and structures." (Id. at ¶ 54.)

Plaintiffs allege that Union Electric's use of their land on or after January 6, 1993, without paying them for the use of the land, caused their damages. (Id. at ¶¶ 62, 63.)

In Count I of the amended complaint, plaintiffs allege an inverse condemnation claim against Union Electric. (Id. at ¶¶ 47-49.) In Count II, plaintiffs allege a trespass claim against Union Electric. (Id. at ¶ 50-64.) On both the Count I inverse condemnation claim and the Count II trespass claim, plaintiffs seek money damages, certification of this action as a class action, and other relief.

**Court of Federal Claims**

On December 28, 1998, plaintiffs filed suit in the Court of Federal Claims against the United States, alleging the conversion of the rail

- 3 -

line to a recreational trail was a taking under the Fifth Amendment. <u>Illig v. United States</u>, 67 Fed. Cl. 47, 50 (Fed. Cl. 2005), <u>aff'd</u> 274 Fed. App'x 883, 2008 WL 1766898 (Fed. Cir. 2008), <u>cert. denied</u>, 129 S.Ct. 2860 (2009).  The court ultimately dismissed plaintiffs' claim for noncompliance with the applicable federal 6-year statute of limitations. <u>Id.</u>

## II.  MOTION TO DISMISS

Union Electric moves to dismiss the amended complaint for failure to state a claim upon which relief can be granted.  (Doc. 128); Fed. R. Civ. P. 12(b)(6).  Union Electric argues that (1) plaintiffs' state law claims are preempted by federal law; (2) the only relief available to plaintiffs is a takings action against the United States in the United States Court of Federal Claims, which is time-barred; (3) plaintiffs' Missouri state law claims are time-barred; and (4) the Count II claim for trespass must be dismissed because under Missouri law plaintiffs cannot bring a trespass claim against a utility company.

In response, plaintiffs argue that they have stated causes of action against Union Electric under Missouri law for inverse condemnation and trespass and that their claims are not time-barred because the applicable statute of limitations is Missouri law's ten-year statute, not the six-year federal statute.

In its reply, Union Electric reasserts that plaintiffs' claims are preempted by federal law, that the United States is the proper defendant, and that plaintiffs' claims are time-barred.

Federal Rule of Civil Procedure 10(c) states that an exhibit attached to a pleading "is a part of the pleading for all purposes." Fed. R. Civ. P. 10(c).  Union Electric's statute of limitations affirmative defense is argued from facts contained in plaintiffs' amended complaint.

## III.  DISCUSSION

**Preemption**

Article VI of the Constitution of the United States provides that federal law is the supreme law of the land.  U.S. Const. art. VI, cl.

- 4 -

2.   Under this Supremacy Clause, if a state law conflicts with the operation or objectives of federal law, the federal law preempts the state law.  Altria Group, Inc. v. Good, 129 S.Ct. 538, 543 (2008); CSX Transp., Inc. v. Easterwood, 507 U.S. 658, 663 (1993).

In determining whether a federal statute preempts state law, the congressional purpose is "the ultimate touchstone."  In re Aurora Dairy Corp., No. 09-2762, 2010 WL 3564849, at *5 (8th Cir. Sept. 15, 2010). Courts look to the express language and the purpose of the statute to determine congressional intent.  Id.  If Congress has legislated in a field traditionally occupied by the states, there is a presumption against preemption unless preemption was "the clear and manifest purpose of Congress."  Id. (citations omitted).  However, if a preemption clause is "susceptible of more than one plausible reading, courts ordinarily accept the reading that disfavors pre-emption."  Franks Inv. Co. LLC v. Union Pac. R. R. Co., 593 F.3d 404, 407 (5th Cir. 2010) (internal citations omitted).  Property law is an area traditionally reserved to the states.  Id.; In re Davis, 170 F.3d 475, 481 (5th Cir. 1999).

In Grantwood Village v. Missouri Pacific Railroad Co., 95 F.3d 654 (8th Cir. 1996), the Eighth Circuit examined whether Missouri Pacific abandoned its interest in a right-of-way when it transferred its rights to Trailnet, such that the adjacent landowner's reversionary interest would have vested.  Id. at 658.  The court explained that "federal law preempts state law *on the question of abandonment* while the ICC retains jurisdiction over the right-of-way" because "the ICC's determination of abandonment is plenary, pervasive, and exclusive of state law."  Id. (emphasis added).  The court then examined the Trails Act:

> Consistent with the purposes of [the Railroad Revitalization and Regulatory Reform Act of 1976, 45 U.S.C. § 801 et seq.], and in furtherance of the national policy to preserve established railroad rights-of-ways for future reactivation of rail service, to protect rail transportation corridors, and to encourage energy efficient transportation use, in the case of interim use of any established railroad rights-of-way pursuant to donation, transfer, lease, sale, or otherwise in a manner consistent with this chapter, if such interim use is subject to restoration or reconstruction for railroad purposes, *such interim use shall not be treated, for purposes of any law or rule of law, as an abandonment of the use of such rights-of-way* for railroad purposes.

- 5 -

Id. at 658-59 (quoting 16 U.S.C. § 1247(d)).  The court held that "the ICC's authorization of interim trail use in its Decision precludes a finding of abandonment of the right-of-way under state law."  Id. at 659.

The Supreme Court has similarly recognized two congressional purposes behind the Trails Act:

> First, Congress intended to encourage the development of additional trails and to assist recreation[al] users by providing opportunities for trail use on an interim basis. Second, Congress intended to preserve established railroad rights-of-way for future reactivation of rail service, to protect rail transportation corridors, and to encourage energy efficient transportation use.

Preseault v. ICC, 494 U.S. 1, 17-18 (1990) (internal quotations and citations omitted).

To obtain compensation for lost property under the Trails Act, a landowner must bring a takings claim against the United States in the United States Court of Federal Claims.  Id. at 11-12, 17.  See also Dave v. Rails-To-Trails Conservancy, 79 F.3d 940, 942 (9th Cir. 1996). Union Electric did not install the electric lines from a right arising out of the Trails Act; Missouri Pacific sold Union Electric a license nearly twenty years before Missouri Pacific conveyed the property to Trailnet.

Although neither Grantwood Village nor the Trails Act explicitly provide that plaintiffs' state law claims are preempted, that is not dispositive of preemption.  In re Aurora Dairy Corp., 2010 WL 3564849, at *6.

In plaintiffs' suit against the United States, the Court of Federal Claims held that "[i]t was the intent of the Trails Act to ensure that Trailnet had the same rights in its easement that [Missouri Pacific] held."  Illig, 58 Fed. Cl. at 632.  The court further found that this was "entirely consistent with the stated purpose of the Trails Act to preserve the railroad corridor in essentially its original character in order that railroad use could one day be reinstated."  Id. at 633.  The court also found that "the payments stemming from the utility licenses were an integral part of the negotiations between Trailnet and [Missouri Pacific] for transfer of the railroad easement."  Id. at 632.

- 6 -

Accordingly, the court turned to Missouri law, because Trailnet's rights, including the right to grant a license to Union Electric, depend on Missouri Pacific's rights under Missouri law. Id. at 633. The court held that Trailnet's right depends on whether the utility has a connection to a railroad purpose, as that was the constraint on Missouri Pacific's ability to grant such a license. Id. at 634. The court found this inquiry "consistent with the intent to preserve the Carondelet Branch for future railroad use." Id.

The court ultimately declined to make the determination, and held that those licenses could not be considered when determining the value of the property taken from plaintiffs via the Trails Act. Illig, 58 Fed. Cl. at 633. Rather, the court held, "[a]s against such users, plaintiffs would have to bring any claims in state court." Id.

In sum, the Court of Federal Claims held that Trailnet obtained the same rights Missouri Pacific had through the conveyance, pursuant to the Trails Act. Whether Trailnet has the right to grant a license to Union Electric depends on whether Missouri Pacific had the right to grant a license to Union Electric. Whether Missouri Pacific had this right is a matter of state law, as Missouri law provides that Missouri Pacific could grant a license to a utility company so long as the utility serves a railroad purpose, and Missouri law defines a "railroad purpose." Id.; St. Louis I. M. & S. R.R. Co. v. Cape Girardeau Bell Tel. Co., 114 S.W. 586, 589 (Mo. Ct. App. 1908). As such, plaintiffs' claims are determined by application of state law.

Given the congressional intent of the Trails Act, as set forth by the Supreme Court, Preseault, 494 U.S. at 17-18, and the Eighth Circuit, Grantwood Village, 95 F.3d at 658-59, the Court of Federal Claims determined that Congress intended Trailnet to have the same rights as Missouri Pacific. As such, congressional intent supports preemption of state law *abandonment* provisions under which the abandoned right-of-way would vest (upon a railroad's abandonment) with the landowner by virtue of the landowner's reversionary interest. In that scenario, the trail group would no longer hold the same rights as the railroad. However, the same rationale does not support preemption of state law claims against third party utility companies. On the contrary, congressional

intent supports the application of state law: plaintiffs would have been able to bring state law claims against Missouri Pacific, and Congress intended Trailnet to be in the same position as Missouri Pacific.

Allowing state law claims against trail groups does not undermine congressional intent to encourage development of trails or preserve railroads; the ability of a trail group to sell a license to a third party utility company neither furthers nor hinders either of these goals.

Under Missouri law, a cause of action for inverse condemnation lies when "a public entity with condemning authority does not actually condemn a parcel of property, but nevertheless appropriates the property for public use." City of Gainesville v. Morrison Fertilizer, Inc., 158 S.W.3d 872, 877 (Mo. Ct. App. 2005). See also Clay County Realty Co. v. City of Gladstone, 254 S.W.3d 859, 863-64 (Mo. 2008) (en banc). Union Electric has the power of eminent domain under Missouri law,[2] and occupies plaintiffs' land, without plaintiffs' permission or compensation to plaintiffs, with power lines which serve the public. (Doc. 128).

Therefore, the court considers plaintiffs' state law claims of inverse condemnation and trespass against Union Electric.

**Count II: Missouri Trespass Claim**

Union Electric argues that it is immune from trespass claims under Missouri law, and therefore Count II must fail. (Doc. 129.) Plaintiffs argue that Missouri law provides trespass as a viable cause of action against Union Electric. (Doc. 138.)

Generally, under Missouri law, "[o]ne can commit the tort of trespass . . . by exceeding the scope of any license to enter upon the land." Ogg v. Mediacom, LLC, 142 S.W.3d 801, 809 (Mo. Ct. App. 2004).

Union Electric argues that under Harris v. L. P. & H. Construction Co., 441 S.W.2d 377 (Mo. Ct. App. 1969), plaintiffs cannot bring a trespass claim. In Harris, landowners brought suit against a public utility company and its contractors, claiming statutory trespass and

---

[2]See Mo. Rev. Stat. § 523.010.

ejectment.  Id. at 373.  The Missouri Court of Appeals held that when the trespasser is a public utility company, and the trespassing structure is permanent and serves the public,

> then the landowner loses the right to force the *removal* of the structure and is entitled and required to recover his damages, past, present, and future for the appropriation, *in one action (but not necessarily in one count)*.  Upon payment of those damages, the public utility acquires an easement for the continued maintenance of the structure.

Id. at 381 (emphasis added).  In that case, according to the court, the public utility "would defeat plaintiffs' *possessory* action."  Id. at 383 (emphasis added).  The court did not bar the landowners' single trespass claim for damages; the court only barred the ejectment claim, which would take possession away from the public utility company.  Id.  The court reasoned that "[t]he power of eminent domain does not carry with it the right to enter upon the land of another, commit a trespass covered by the statute here involved, and in defense to such action claim the power to condemn."  Id. at 382.  Despite Union Electric's argument that plaintiffs only remedy under Harris is a single condemnation action, the Harris court held that "condemnation cannot relieve defendants from liability for the damages resulting to the plaintiffs from the prior trespassing."  Id.

The Missouri Court of Appeals applied this reasoning in Mapco, Inc. v. Williams, 581 S.W.2d 402 (Mo. Ct. App. 1979), holding that the landowners' claim for ejectment was barred by Harris, but that the landowners "still [had] a right of action against Mapco for that trespass, including a claim for punitive damages."  Id. at 406.  The court reasoned: "[A] condemnation action . . . cannot operate by relation back to wipe out the wrongful trespass [which occurred before the condemnation action]."  Id.  Accordingly, the court granted the landowners leave to amend their pleadings to seek damages in lieu of ejectment.  Id. at 407.

In sum, neither Harris nor Mapco preclude a single trespass claim against a public utility company, even when the trespassing structure is permanent and serves the public.  Rather, these cases preclude a landowner from seeking ejectment and possession of the land when the

trespasser is a public utility company and the trespassing structures are permanent and serve the public.

In this case, plaintiffs seek money damages via trespass, not possession via ejectment.  (Doc. 122 at 12.)  Therefore, Missouri law does not preclude plaintiffs' trespass claim.

**Statutes of Limitations**

Union Electric argues that plaintiffs' Missouri law claims are time-barred because any taking occurred under the Trails Act, which imposes a six-year limitations period beginning with the issuance of the NITU on March 25, 1992.  (Doc. 129 at 9-10.)  Because plaintiffs brought suit on December 23, 2002, Union Electric argues that the claims are untimely.  (Id.)  Plaintiffs argue that the statutory limitations period began on January 6, 1993 with the execution of the Trail Use Agreement between Missouri Pacific and Trailnet and the issuance of the quitclaim deed to the property by Missouri Pacific to Trailnet.

Union Electric's argument is based on Caldwell v. United States, 391 F.3d 1226 (Fed. Cir. 2004), where the Federal Circuit held that the six-year statute of limitations for takings claims against the United States begins to run when the STB issues a NITU.  Id. at 1235.  Here, however, plaintiffs have brought state law claims against Union Electric.

The court must look to Missouri law for the applicable statutory limitations periods for the state law claims.  Under Missouri law, the statutory limitations period for bringing plaintiffs' Count I real property inverse condemnation claim is ten years.  Mo. Rev. Stat. § 516.010; Shade v. Mo. Hy. and Transp. Com'n, 69 S.W.3d 503, 512-13 (Mo. Ct. App. 2001).  Missouri's 5-year statute of limitations governs plaintiffs' Count II trespass claim.  Mo. Rev. Stat. § 516.120(3).

On plaintiffs' Count I inverse condemnation claim, the 10-year limitations period began to run when the existence of damage became ascertainable, Crede v. City of Oak Grove, 979 S.W.2d 529, 534 n.3 (Mo. Ct. App. 1998), that is, when the right to sue arose, Jepson v. Stubbs, 555 S.W.2d 307, 312 (Mo. 1977) (en banc).  Similarly, for plaintiffs' Count II trespass claim, the limitations period began to run also "when

the damage resulting [from the trespass] [was] sustained and [was] capable of ascertainment . . . ." Cook v. DeSoto Fuels, Inc., 169 S.W.3d 94, 103 (Mo. Ct. App. 2005).

Thus, to determine when the limitations periods for plaintiffs' Missouri state law claims for inverse condemnation and trespass began to run, the court must determine from plaintiffs' allegations when they sustained the damages they claim and when the existence of those damages became ascertainable. Plaintiffs' allegations are that Trailnet never obtained the requisite property interest in plaintiffs' land necessary to charge Union Electric for its physical use of the land on or after January 6, 1993, and that Union Electric's payment to Trailnet of license fees for this use of the land instead of plaintiffs on or after January 6, 1993 was wrongful. The underlying law does not support plaintiffs' arguments of when their claims arose.

Plaintiffs argue that, when Missouri Pacific "abandoned" its right-of-way over plaintiffs' property, it "abandoned" its right to derive income from Union Electric's use of plaintiffs' property for its electrical transmission lines.[3] As Union Electric argues, the Caldwell case established that the federal taking by Trailnet under the Trails Act occurred when the ICC (now the Surface Transportation Board) issued the NITU on March 25, 1992. The taking was of all the property rights that Missouri Pacific had in plaintiffs' property, subject to the two express exceptions that are not relevant here. These property rights

_____

[3]The Court of Federal Claims has suggested a possible issue arising from Union Electric's original installation of electric lines on the subject property. That court suggested that, if the electric lines were not originally connected to a "railroad purpose," Missouri Pacific might never have had the right to grant Union Electric permission to install and operate the lines. Illig, 58 Fed. Cl. at 632-33. If the electric lines were connected to a "railroad purpose" and Missouri Pacific had the right to grant Union Electric permission, then perhaps plaintiffs' claims would fail now because Trailnet acquired all of Missouri Pacific's rights through the Trails Act. Id. These statements by the Court of Federal Claims were indicated, of course, by that court's rulings in an earlier case that the application of the Trails Act effected a taking of the property interest that supports a use of the property other than for either trail use or railbanking. Glosemeyer v. United States, 45 Fed. Cl. 771, 778 (2000). This court does not reach these issues, because it concludes below that this lawsuit was not commenced soon enough to bring such a claim.

- 11 -

included the income producing interests in the subject property that Union Electric continued to use.

In Caldwell v. United States, 391 F.3d 1226 (Fed. Cir. 2004), the Court of Appeals for the Federal Circuit held that under the Trails Act that, if "the [Surface Transportation Board] relinquishes jurisdiction over the abandoned railroad right-of-way, [then] state law reversionary property interests, if any, take effect."   391 F.3d at 1228-29. However,

> the Trails Act allows a railroad to negotiate with a state, municipality, or private group (the "trail operator") to assume financial and managerial responsibility for operating the railroad right-of-way as a recreational trail.  If the railroad and the trail operator indicate willingness to negotiate a trail use agreement, the STB stays the abandonment process and issues a notice allowing the railroad right-of-way to be "railbanked."  The effect of the notice, if the railroad and prospective trail operator reach an agreement, is that the STB retains jurisdiction for possible future railroad use and the abandonment of the corridor is blocked "even though the conditions for abandonment are otherwise met."  Specifically [the Trials Act] provides that "such interim use [for trails] shall not be treated, for purposes of any law or rule of law, as an abandonment of the use of such rights-of-way for railroad purposes."  Thus [the Trails Act] prevents the operation of state laws that would otherwise come into effect upon abandonment-property laws that would "result in extinguishment of easements for railroad purposes and reversion of rights of way to abutting landowners."  A Fifth Amendment taking occurs if the original easement granted to the railroad under state property law is not broad enough to encompass a recreational trail.

Id. at 1229 (internal citations omitted).

Regarding the legal effect of the STP issuing an NITU, the Federal Circuit Court stated:

> This NITU permits the railroad to discontinue service, cancel tariffs, and salvage track and other equipment, "consistent with interim trail use and rail banking" without consummating an abandonment and the NITU extends indefinitely to permit interim trail use once an "agreement" is reached between the railroad and the trail operator.

Id. at 1230.  Further, once a trail use agreement is entered, "[t]he STB retains jurisdiction for possible future railroad use, and state law reversionary interests that would normally vest upon abandonment are blocked."   Id.

- 12 -

Plaintiffs allege that they own the property interests currently exercised by defendant Union Electric.  They argue that those interests reverted to them on January 6, 1993, when Missouri Pacific's quit claim deed was filed with the St. Louis County Recorder of Deeds.  (Doc. 122-14 at 3.)  Defendants argue that those property interests reverted to the plaintiffs as owners of the underlying property, or did not revert but were taken from them, on March 25, 1992, when the ICC issued its Notice of Interim Trail Use or Abandonment.

The court agrees with defendants.  If, as plaintiffs allege and argue, the taking from them pursuant to the Trails Act included their rights to Union Electric's use of their property, under <u>Caldwell</u> that taking occurred with the issuance of the NITU on March 23, 2002.  On that date, the state law claims asserted by plaintiffs in this action arose; on that date plaintiffs' alleged property interests were either revived or they continued dormant.  Plaintiffs did not file suit to vindicate those property rights until after the 10-year limitations period for their inverse condemnation claim and after the 5-year limitations period for their trespass claim had passed, both of which limitations periods began on March 23, 2002.

### CONCLUSION

Because plaintiffs did not commence this judicial action within the applicable statutory limitations periods, the motion of the defendant to dismiss is sustained.  An appropriate Judgment Order is issued herewith.


      /S/   David D. Noce      
**UNITED STATES MAGISTRATE JUDGE**


Signed on October 29, 2010.

- 13 -